# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-CR-77-NT |
| | ) | |
| CHARLES LEONARD, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Before me is Defendant Charles Leonard's motion to suppress the shotgun and ammunition seized during a warrantless search of his home. (ECF No. 15). Mr. Leonard argues that the officers' initial entry and search of his home was unjustified, which tainted the voluntariness of his later consent to search the home. The Government responds that the sweep was a permissible precautionary measure taken to ensure there was no one in the home who presented a threat to the officers. For the following reasons, the motion to suppress is **GRANTED**.

## FINDINGS OF FACT

The events leading up to the contested search began two weeks prior. On September 8, 2015, Det. William Tapley of the Lisbon Police Department received a call about an attempted purchase of a firearm at the Double Diamond Pawn Shop in Lisbon, Maine. The manager of the shop was Det. Tapley's former partner, and he told Det. Tapley that he suspected the two men who came into the shop, Charles

Leonard and Harley Stanley, were felons.[1] The shop did not sell Mr. Leonard the .40 caliber pistol he selected because the address on his paperwork did not match the address on Mr. Leonard's identification.[2] *See* Hearing Tr. Sept. 15, 2017 at 05:13-18 ("**Hearing Tr.**"); Gov't's Ex. 3.

Det. Tapley ran a criminal record check on both men and found that Mr. Stanley had a Class C felony for receiving stolen property and some outstanding warrants for unpaid fines. Hearing Tr. 44:06-18; Gov't's Ex. 1; Gov't's Opp'n 2 (ECF No. 17). Mr. Leonard had a misdemeanor criminal record. Hearing Tr. 63:07-18; Gov't's Ex. 2. Det. Tapley also reviewed the Double Diamond's security video footage and observed Mr. Stanley handling several handguns and putting money on the counter. Hearing Tr. 09:05-10:06. Det. Tapley suspected that Mr. Leonard had attempted to make a straw purchase of the firearm for Mr. Stanley. Hearing Tr. 07:04-15.

On September 12, 2015, Det. Tapley recognized Mr. Leonard's truck and made a traffic stop. Mr. Leonard was driving, and Mr. Stanley was a passenger. Det. Tapley arrested Mr. Stanley without incident on the outstanding warrants. Hearing Tr. 11:14-12:03. Det. Tapley mentioned to Mr. Leonard that he wanted to ask him about

---

[1]     The Government refers to Mr. Stanley as both Harley and Hartley. *Compare* Gov't's Opp'n 2, 8, *with* Gov't's Opp'n 9 (ECF No. 17).

[2]     A person seeking to purchase a firearm from a federally licensed firearms dealer must complete a Firearms Transaction Record (ATF Form 4473), which requires biographical information on the purchaser and contains a series of questions designed to elicit whether the dealer may lawfully sell the firearm to the purchaser.

the purchase of a firearm at the Double Diamond and that he would do so at a later date. Hearing Tr. 12:04-14.

Det. Tapley shared the information he had developed with Christopher Durkin, a special agent with Bureau of Alcohol, Tobacco, Firearms, and Explosives. On September 23, 2015, SA Durkin and Det. Tapley went to Mr. Leonard's residence to see if Mr. Leonard would consent to an interview, often referred to as a "knock and talk" in police jargon. The officers had no arrest or search warrant.

Mr. Leonard's home was a single-wide trailer near the end of a dirt road in a trailer park that was familiar to Det. Tapley from prior unrelated visits. Hearing Tr. 15:02-06. The east wall of the trailer was approximately 12 feet wide and faced the road. Hearing Tr. 24:04-14; Gov't's Ex. 31; Gov't's Ex. 35. The trailer's exterior doors were on the north and south walls, which were approximately 40 feet long. Hearing Tr. 15:07-10; Gov't's Ex. 35.

When the officers arrived, they detected the strong smell of cultivated marijuana. Hearing Tr. 14:08-15. SA Durkin activated a digital recorder that he wore on his person. Durkin Recording (Gov't's Ex. 7). The officers approached the door on the south wall of the trailer and knocked. Durkin Recording 00:43-00:47. They heard noise like rustling or movement. Hearing Tr. 16:09-15, 77:12-18, 90:17-23. One of the officers can be heard on the recording saying casually "there might be a kid in there." Durkin Recording 00:58. Det. Tapley suspected that someone might be exiting the other side of the trailer, and SA Durkin went around to check. Hearing Tr. 16:09-15. When he got around to the other side of the trailer, SA Durkin met Mr. Leonard

coming out the back door. SA Durkin, speaking "casually" with Mr. Leonard, walked to the east side of the trailer with Mr. Leonard so that he could see the front entryway. Hearing Tr. 78:23-79:02.

At approximately this time, Stevie Bean answered the front door. Ms. Bean lives in the trailer with Mr. Leonard and their two-year-old child, MC. Durkin Recording 03:54-04:00. Det. Tapley did not see marijuana from the door, but, based on the smell, he asked Ms. Bean how much marijuana was inside, and she said "a lot." Hearing Tr. 15:25-16:01, 18:03-11.[3] After consulting briefly with SA Durkin, who was talking to Mr. Leonard at the east side of the trailer, Det. Tapley returned to Ms. Bean at the primary door, and she indicated that Mr. Stanley was inside. Hearing Tr. 18:13-19:05.

Det. Tapley entered and walked through the trailer to find Mr. Stanley. He did not request backup or warn SA Durkin that he was going inside the home. Det. Tapley testified that he had no recollection of whether he drew his weapon when conducting his protective sweep. He testified that he "hoped" he had his weapon drawn as that would be proper protocol. Hearing Tr. 67:03-06, 68:11-13. He can be heard calling out "Harley!" on the recording. Durkin Recording 5:40.

Approximately six minutes into the encounter, Det. Tapley rejoined SA Durkin, who was standing outside the trailer with Mr. Leonard, Ms. Bean, and MC.

---

[3]     Det. Tapley's testimony about his first conversation with Ms. Bean was somewhat contradictory with regard to Mr. Stanley. On direct, he said he asked Ms. Bean if anyone was inside and she said no. Hearing Tr. Sept. 15, 2017 at 17:25-18:02 ("**Hearing Tr.**"). On cross-examination, Det. Tapley said the conversation was quick, and he did not have a strong memory. He believed that he asked Ms. Bean where everybody was, she said she was not sure, and then he asked about the smell of marijuana. Hearing Tr. 65:10-14.

Det. Tapley asked SA Durkin whether he saw Mr. Stanley come out the back and surmised that Mr. Stanley may still be in the trailer. Durkin Recording 06:30-06:36. SA Durkin said he could "hear him in there." Durkin Recording 06:37. Without asking for assistance, Det. Tapley returned to searching and calling out "Harley come out. Harley! Where are ya?" Durkin Recording 06:40. SA Durkin meanwhile resumed questioning Mr. Leonard about the straw purchase, while MC threw clumps of dirt at SA Durkin. Durkin Recording 07:10.

Approximately eight minutes into the encounter, Det. Tapley came outside of the trailer and said "he apparently went out the window." Durkin Recording 08:12. He instructed Ms. Bean, "[c]ome with me and show me where he might be hiding." Durkin Recording 08:18. Det. Tapley then took Ms. Bean back into the trailer. Once inside the trailer, Det. Tapley read the Miranda warnings to Ms. Bean and asked her questions about the marijuana which was drying throughout the trailer. Det. Tapley asked if Ms. Bean would consent to a search of the house, and he called Officer Richard St. Amant to deliver a consent to search form.

Approximately 11 minutes into the encounter, Officer St. Amant arrived. He greeted SA Durkin and asked him how he was doing. SA Durkin replied: "Been better. Bill's inside there. I don't know what's going on." Durkin Recording 11:35. Officer St. Amant then carried the unsigned consent-to-search forms into the trailer. While still standing inside the trailer, Det. Tapley continued to speak with Ms. Bean about the marijuana, informed her that he could get a search warrant based on what he had

seen so far, and read through the consent form. Hearing Tr. 31:20-32:14. Ms. Bean signed. Gov't's Ex. 9.

A few minutes later, SA Durkin joined the other officers, at which point all three officers were inside the trailer without warrants or Mr. Leonard's consent. Durkin Recording 13:43. Officer St. Amant told SA Durkin that Mr. Stanley was "gone," and SA Durkin confirmed that the police did not "have anything on him anyways." Durkin Recording 14:04-14:12. Det. Tapley then asked Officer St. Amant "mind staying out here, Rich?" Durkin Recording 14:47. And to SA Durkin, Det. Tapley asked:

> WT: You have your recorder on?
>
> CD: I do. I'm done talking to him he's denying all of it saying there's no way he's buying a gun for anybody else.
>
> WT: Ok.
>
> CD: You want to talk to me about something else?
>
> WT: Yea.
>
> CD: End of interview.

Durkin Recording Tr. 12 (ECF No. 22-1); Durkin Recording 14:47-14:59. SA Durkin then turned off his recording device. SA Durkin testified that he turned his recorder off because he was finished with the investigation into the firearm and saw no reason to record the rest of the encounter. Hearing Tr. 96:10-25.

SA Durkin said he restarted the recording again after walking from the trailer to car. Hearing Tr. 97:03-15. When the recording began again, Det. Tapley was reading Mr. Leonard the Miranda warnings outside of the trailer. Mr. Leonard said

he did not want to answer questions. Durkin Recording 16:00-16:13. Det. Tapley then told Mr. Leonard that he knew Mr. Leonard had a four-wheeler, that marijuana was stolen in Lisbon by someone with a four-wheeler, and that Ms. Bean said the marijuana in the house was stolen.[4] Det. Tapley informed Mr. Leonard that Ms. Bean already consented to a search and that "we obviously know there's marijuana here." Durkin Recording 16:50-17:05. Det. Tapley told Mr. Leonard he could consent to a search of his home or the police would get a search warrant. Durkin Recording 17:05-17:10. Mr. Leonard asked what the search would be for, and Det. Tapley responded "to collect all the weed." Durkin Recording 17:10-17:15. SA Durkin told Mr. Leonard that it was it was "highly likely" that they would get a warrant so the process was "just a formality," "paperwork." Durkin Recording 17:25-17:37. Det. Tapley chimed in, "So most likely we are going to get the search warrant because we have already seen the marijuana," and added "we are here lawfully to talk about this gun." Durkin Recording 17:38-17:55. Mr. Leonard responded, "So what was the whole reason to go in my house?" Durkin Recording 17:55-18:00. Det. Tapley responded:

> Because we could hear movement and there was pot in there. And when I talked to her at the door I said hey you told you were just smoking a joint so when I said hey do you have any more pot in here? She goes yea the whole house is filled with pot. So and its drying in the kitchen there's a bowl in the kitchen there's a screen above. I mean it's everywhere. You know what I mean and she tells me Harley is in there and I go looking for Harley obviously he's hiding and that makes me able to go search for him cause that puts us at risk. There's pot in every room of the house.

Durkin Recording 18:00-18:30.

---

[4] The Lisbon theft was never connected to the marijuana found at Mr. Leonard's home. Hearing Tr. 46:02-47:02.

Pushed on the consent form, Mr. Leonard said, "I don't want to sign that," and he asked twice to be allowed to speak with Ms. Bean. Durkin Recording 17:15-17:20, 19:00-19:10. Ms. Bean confirmed to Mr. Leonard that the officers already saw the marijuana when looking for Stanley. Durkin Recording 19:50-20:00. In total, the officers spoke with Mr. Leonard for approximately four and a half minutes about consent and the marijuana in the trailer before Mr. Leonard signed the form. Durkin Recording 16:45-21:08; Gov't's Ex. 9.

The officers then conducted a full search of the trailer and, as expected, recovered approximately 4.4 pounds of marijuana buds. Hearing Tr. 36:13-23. The officers were at Mr. Leonard's residence for approximately two hours. Hearing Tr. 115:10-19. "Toward the end of the search," Det. Tapley noticed for the first time a shotgun on top of an entertainment center in the living area. Hearing Tr. 37:21-25. Next to it were five ammunition shells. SA Durkin recognized, based on his expertise, that the barrel of the gun was less than the legal requirement. The overall length of the shotgun was not under the legal limit. Gov't's Ex. 26; Hearing Tr. 88:06-10. Mr. Leonard agreed to forfeit the gun, which is now the focus of this motion. Mr. Leonard and Ms. Bean were issued a summons for the marijuana but not arrested.

## DISCUSSION

### I. Warrantless Entry and Search of a Home

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and,

8

absent exigent circumstances, the government is required to obtain a warrant before entering a home. *Payton v. New York*, 445 U.S. 573, 585, 590 (1980). "Because the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies." *United States v. Delgado-Perez*, 867 F.3d 244, 251 (2017) (quoting *United States v. Infante*, 701 F.3d 386, 392 (1st Cir. 2012); *see also United States v. Martins*, 413 F.3d 139, 146 (1st Cir. 2005). "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to show the legitimacy of the search." *Delgado-Perez*, 867 F.3d at 251 (quoting *United States v. Winston*, 444 F.3d 115, 123-24 (1st Cir. 2006)).

Here, the Government argues that Det. Tapley's initial search of the home was a "protective sweep," justified "to ensure there was no threat lurking there." Gov't's Opp'n 9. Mr. Leonard argues that there was no exigency that justified the officers' entry into the home. Mot. to Suppress 3.

Exigent circumstances present an exception to the warrant requirement in "those situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant." *Martins*, 413 F.3d at 146. Examples of exigent circumstances include: (i) hot pursuit of a fleeing felon; (ii) threatened destruction of evidence; (iii) risk the suspect will escape undetected; (iv) threat posed by the suspect to the safety of police or the public; (v) and the need to give emergency aid. *Id.* at 146-47. At a hearing on the motion, the Government

explicitly stated that officers were not acting on the threatened destruction of evidence—only on the threat posed by Mr. Stanley's presence. Hearing Tr. 124:08-13.

The Government cites to *United States v. Martins* for the principle that "[i]n the interests of safety, law enforcement can conduct protective sweeps of areas that may harbor a threat." Gov't Opp'n 7. The *Martins* court found that an officer's entry of an apartment without a warrant was justified where it determined that a young boy inside might be in danger. *Id.* at 148-49. The officer was responding to a nearby shooting, and there was a gunshot victim outside the apartment. The apartment was filled with marijuana smoke, and a boy who answered the door claimed to be home alone, but the officer had heard an adult voice when he initially knocked. *Id.* at 144, 147-48.

The court in *Martins* analyzed the initial warrantless entry and then the subsequent protective sweep under different standards. Regarding entry based on an exigency, the court held that:

> police, in an emergency situation, may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm. To rely upon the doctrine, the government must show a reasonable basis, approximating probable cause, for both the officers' belief that an emergency exists and for linking the perceived emergency with the area or place in which they propose to intrude . . . . in light of the totality of the circumstances.

*Martins*, 413 F.3d at 147; *accord Infante*, 701 F.3d at 392.

After finding that the initial entry was lawful due to concern for the child, *Martins* separately analyzed the legality of the protective sweep that followed. *Martins*, 413 F.3d at 148-49. At this step, the court applied the reasonable suspicion test for a protective sweep articulated by the Supreme Court in *Maryland v. Buie*,

494 U.S. 325, 327 (1990). *See Martins*, 413 F.3d at 149. In *Buie,* the Court carved out an exception to the search warrant requirement for a "protective sweep," defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." 494 U.S. 325, 327 (1990). A protective sweep is justified only where officers can point to "articulable facts which, taken together with the rational inferences from those facts" warrant a belief "that the area swept harbor[s] an individual posing a danger." *Id*. The justification to conduct a protective sweep endures "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36.

In *Martins*, the First Circuit noted that *Buie* was concerned with protective sweeps incident to arrest, but that protective sweeps logically could follow where police lawfully enter a home "either with a warrant or upon probable cause plus exigent circumstances." 413 F.3d at 149-50 (citing *United States v. Gould*, 364 F.3d 578, 584-87 (5th Cir. 2004) for the principle that "a protective sweep may be justified so long as police did not enter illegally"). Applying *Buie*, the *Martins* court concluded that the protective sweep was lawful because the officer's initial entry was lawful under the emergency aid doctrine and because the evidence under the totality of the circumstances established that the unknown adult believed to be hiding in the apartment posed a threat to the officers on the scene. *Id*. at 151. This evidence included the location in a high-crime area, the recent shooting, the connection of the

shooting to the apartment, the officer's knowledge of gang behavior, and the evasive behavior of the adult behind the door. *Id.*

In this case, the officers were lawfully outside the door to request a consensual interview with Mr. Leonard. *See United States v. Perez-Diaz*, 848 F.3d 33, 39 (2017) (in conducting an investigation, "[a] police officer may approach and knock on a citizen's front door, and request the opportunity to speak to the citizen . . . . The citizen does not have to answer or speak to the police officers, and if he does speak to the officers, he does not have to allow them into their homes."). But the Government must establish that Det. Tapley lawfully entered the house under exigent circumstances and that his protective sweep was supported under the *Buie* standard.

The Government contends that Mr. Stanley's presence in the house posed a threat to the officers. The circumstances identified by the Government supporting the perception of a threat were that: 1) the officers smelled cultivated marijuana and Ms. Bean confirmed there was "a lot" inside the trailer; 2) when the officers knocked, they heard "movement" inside, 3) Ms. Bean said that Mr. Stanley was in the trailer, and 4) the officers knew that Mr. Stanley was a felon suspected of participating in an attempted straw purchase of a firearm at the Double Diamond two weeks prior. This volatile combination of a felon in a trailer with marijuana and possibly guns put the police at risk, according to the Government.

It is possible to envision a scenario where the police, lawfully at a doorstep, perceive such a significant threat from within a home as to create an officer safety

justification for a warrantless entry based on exigent circumstances. The evidence presented at the hearing, however, falls short.

The analysis must focus on the facts that were known to the police at the moment that Det. Tapley crossed the threshold into the house without a warrant. It is true that Det. Tapley knew that Mr. Stanley was a felon, but he was aware that Mr. Stanley's felony conviction was for receiving stolen property as opposed to some other violent offense. Further, the police did not have a warrant to arrest Mr. Stanley, and SA Durkin noted at the scene that the police "did not have anything on him." One week prior, Det. Tapley himself had arrested Mr. Stanley on warrants for unpaid fines without any trouble. There is no evidence suggesting that Mr. Stanley was violent or otherwise unstable. While it is true that the police were investigating an attempted straw purchase of a firearm for Mr. Stanley, Det. Tapley knew that Mr. Leonard had not been able to purchase the firearm at the Double Diamond. There is no evidence suggesting that Mr. Stanley possessed a gun inside the trailer. *See Delgado-Perez*, 867 F.3d at 256 ("[L]ack of information cannot provide an articulable basis upon which to justify a protective sweep.").

Furthermore, Det. Tapley's conduct is inconsistent with the Government's claim that Mr. Stanley posed a threat to officer safety. Det. Tapley did not even tell SA Durkin that he was going into the trailer when he initially entered. Nor did Det. Tapley call for any back up. Det. Tapley testified that he "hoped" he had drawn his weapon, but he could not recall. I find it difficult to believe that Det. Tapley would

not have recalled drawing his weapon if he had, and I believe it is more likely than not that he did not draw his weapon.

Det. Tapley's conduct *after* he went into the trailer also undermines the Government's claim that the police perceived a threat to their safety. As the recording reveals, Det. Tapley's tone was colloquial as he called Mr. Stanley by his first name: "Harley come out. Harley! Where are ya?" Det. Tapley came in and out of the trailer several times to check in with SA Durkin, but he never warned SA Durkin to move out of range or asked him for help in the search for Mr. Stanley. Tellingly, Det. Tapley asked Ms. Bean to come inside to make sure he had not missed a hiding place. No police officer fearing an ambush would involve an innocent bystander.

It is clear from the recording that SA Durkin did not perceive any exigency either. When SA Durkin heard Det. Tapley conducting his search and learned that Mr. Stanley was present, he responded, "Oh, ok," and then changed the subject to MC's bad behavior. Approximately a minute later, SA Durkin observed to Det. Tapley that he could hear Mr. Stanley in the trailer, and then he immediately resumed trying to interview Mr. Leonard about the suspected straw purchase. If SA Durkin believed that Mr. Stanley posed a threat, I am quite confident that he would have led MC to safety. Instead, SA Durkin, Mr. Leonard, and MC stayed outside the trailer within a few feet of a bedroom window. When Officer St. Amant arrived, SA Durkin told him that he could find Det. Tapley inside the trailer, but SA Durkin did not provide Officer St. Amant with any warning regarding the possible presence of Mr. Stanley.

On the record before me, the Government has not pointed to "articulable facts which, taken together with the rational inferences from those facts" support a belief that concerns of officer safety justified the warrantless entry into the home, or "that the area swept harbored an individual posing a danger." *Buie,* 494 U.S. at 327.[5] The warrantless entry and protective sweep were unjustified and violated Mr. Leonard's Fourth Amendment protection from unreasonable search.

## II.    Tainted Consent

Having found that the protective sweep violated the Fourth Amendment, I turn to whether Mr. Leonard's consent to search his home was tainted by the prior unlawful protective sweep. Mr. Leonard argues that the shotgun and ammunition casings discovered during the consented-to search must be suppressed as the fruit of the earlier unlawful search. The Government responds that Mr. Leonard and Ms. Bean voluntarily consented to the search.

Consent to search is a valid exception to the warrant requirement where the government can prove by a preponderance of the evidence that the consent was voluntary under the totality of circumstances. *Perez-Diaz*, 848 F.3d at 39. Where consent to search was given after an unlawful search, the First Circuit has "emphasized the importance of determining whether the prior illegality significantly

---

[5]    I further note that even if the Government had satisfied its burden to show an exigency to enter the home and to secure Mr. Stanley upon their arrival, the sweep as conducted far exceeded the permissible scope of a justified protective sweep. Det. Tapley spent approximately fifteen minutes conducting his sweep of the 480 square foot trailer. This was not "a quick and limited search of premises," or "a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327. Moreover, Officer St. Amant and SA Durkin crossed the threshold without any purpose to help in the sweep. Rather, they agreed among themselves that Mr. Stanley was gone and they did not "have anything on him anyways."

influenced or played a significant role in the subsequent consent." *Delgado-Perez*, 867 F.3d at 257. Suppression of evidence obtained after an illegal search turns on whether the evidence was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 256-57 (quoting *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir. 1983)). Factors include temporal proximity, intervening circumstances, and "the purpose and flagrancy of the official misconduct." *Id.* at 257.

In *Delgado-Perez*, the First Circuit found a causal link between an unlawful search and later consent to search based on three factors. First, the court determined that there was no evidence that the officers would have asked the arrestee if there were any weapons in the residence; second, there was no evidence the arrestee would have offered up that information; and third, the government made no argument that the consent was not tainted fruit of the unlawful sweep. *Id.* at 257-58. The court concluded that "we do not see how [the defendant's] consent to do the full-residence search was not significantly influenced by the fact that [the defendant] knew the protective sweep had occurred." *Id.* at 259.

Here, like in *Delgado-Perez*, the officers were not asking Mr. Leonard about weapons he possessed. They knew Mr. Leonard had no felony record that would limit his right to own a firearm, and their initial suspicion was about his *failed* attempt to purchase a gun for Mr. Stanley. As the events evolved, their focus broadened to include the cultivated marijuana, but they still did not touch on possession of a firearm.

There is also no evidence that Mr. Leonard would have told the officers about his shotgun. When asked by SA Durkin about why he would have wanted to purchase a handgun, Mr. Leonard did not mention that he already owned a shotgun. Instead, he returned again to the subject of marijuana in his house, saying "that's what I'm worried about." Durkin Recording 09:00-09:30.

And third, the Government has not addressed the taint of the unlawful search. Rather, the Government maintains that Mr. Leonard and Ms. Bean's knowledge that the officers had seen the marijuana in the house goes to the voluntariness of their consent. Gov't's Opp'n 11-14. The Government's theory is that this knowledge afforded Mr. Leonard and Ms. Bean "a fair appraisal" or a "reasonable assessment" of their choice between search through consent or through the slower, but nearly as certain process of obtaining a warrant. Gov't's Opp'n 11, 13. "[B]y the time [Mr. Leonard] consented to the search," the Government states, "he knew that Durkin and Tapley had ample reason to believe that he illegally possessed a substantial amount of marijuana at least." Gov't's Opp'n 12-13.

I find that the prior unlawful search "significantly influenced or played a significant role in the subsequent consent." *See Delgado-Perez*, 867 F.3d at 257. Mr. Leonard's consent to search was tainted by the unjustified entry and protective sweep, and suppression is warranted for the fruits of that search.[6] *Id.* at 256-57.

---

[6] Finding Mr. Leonard's consent invalid, the validity of Ms. Bean's consent becomes non-dispositive. "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). Nonetheless, it is evident that Ms. Bean's consent was also tainted by the unlawful entry and sweep.

## III.    Inevitable Discovery Doctrine

Finally, the Government contends that the inevitable discovery doctrine precludes suppression. Evidence discovered by unlawful means may yet be admitted where the evidence "would inevitably have been discovered without reference to the police error or misconduct." *Nix v. Williams*, 467 U.S. 431, 448 (1984). The Government bears the burden on this issue, and must show "by reference to demonstrated historical facts and by a preponderance of the evidence that the information or item would inevitably have been discovered by lawful means." *Delgado-Perez*, 867 F.3d at 258 (citing *United States v. Infante-Ruiz*, 13 F.3d 498, 503 (1st Cir. 1994)). Courts are instructed to evaluate whether:

> (i) the lawful means of its discovery are independent and would necessarily have been employed; (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

*United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

The entire sum and substance of the Government's inevitable discovery argument is contained in the following paragraph:

> If they had not consented, Tapley and Durkin would have been able to obtain a search warrant and inevitably would have found the shotgun. By the time that Tapley asked Bean for consent, he had enough lawfully obtained information to obtain a warrant to search for evidence of unlawful trafficking in marijuana at least. Under these circumstances, applying the inevitable discovery doctrine will not undermine the purposes of the Fourth Amendment suppression doctrine because there was no violation of the Fourth Amendment up to that point to deter. *See Hughes*, 640 F.3d at 420.

---

She signed the consent form in the presence of at least two officers who had already spent a considerable amount of time in her home, in violation of her Fourth Amendment rights.

Gov't's Opp'n 13-14.

The Government contends that "[b]y the time that Tapley asked Bean for consent," he had enough lawfully obtained information to obtain a warrant to search for evidence of unlawful trafficking in marijuana. But the critical point at which to assess the evidence known to the police is not the moment at which Det. Tapley sought consent but rather the moment Det. Tapley first crossed the threshold into the trailer. At that point, the officers had smelled cultivated marijuana, they had heard the sound of movement within the house after they knocked on the door,[7] Mr. Leonard had exited out the backdoor, and Ms. Bean had confirmed that there was "a lot" of marijuana in the trailer. Assuming, arguendo, that this evidence was sufficient to establish probable cause for a search for "evidence of unlawful trafficking in marijuana," the Government made no attempt to show that the officers actually would have pursued a warrant based on the evidence they possessed at that moment. There was also no testimony from the police that they "would necessarily" have obtained a warrant. *Zapata*, 18 F.3d at 978. And although Det. Tapley and SA Durkin told Ms. Bean and Mr. Leonard that they would get a warrant to seize the marijuana, those statements were made only *after* Det. Tapley had entered the residence and seen just how much marijuana was there.

Additionally, the Government's reasoning that application of the inevitable discovery doctrine will not encourage police misconduct because there was no police

---

[7] The sound of movement after the police knocked adds little. In such a small trailer, one would expect to hear movement if someone got up to answer the door. The officers did not testify that there was anything unusual about the sound.

misconduct to deter is circular. The application of the inevitable discovery doctrine here would encourage police misconduct, particularly where, as here, the police had no arrest warrant for anybody inside the home, there was no parallel effort being made to get a warrant, and no warrant was later sought. *See United States v. Silvestri,* 787 F.2d 736, 745 (1st Cir. 1986) (discussing various independent and inevitable paths to information and cautioning that admission of evidence under the inevitability doctrine where no warrant was pursued "substantially weakens the protection provided by the Fourth Amendment").

The only case cited by the Government, *United States v. Hughes*, 640 F.3d 428 (1st Cir. 2011), is very distinguishable. In *Hughes*, the officers conducted a knock and talk seeking information to procure a warrant, and they had support standing by to apply for a warrant. A warrant to search the defendant's home and computer issued the following day. *Id.* at 440-41.

*Delgado-Perez,* cited by the Defendant, is much closer to the facts of this case. It instructs on the application of the inevitable discovery doctrine where the defendant consented to search only after the police had noticed incriminating evidence during a protective sweep. As here, the government in *Delgado-Perez* failed to make the case that the defendant "would inevitably have freely consented to a search of his home—thereby resulting in the discovery of the magazine and the loaded firearm—even if there had been no unlawful protective sweep." *Delgado-Perez,* 867 F.3d at 258. Ms. Bean and Mr. Leonard were both heavily influenced in their knowledge that the officials had already seen the marijuana in the house. Moreover,

the evidence suggests that Mr. Leonard would not have otherwise freely consented to a search of his home. Even knowing that the officers had spent approximately fifteen minutes in the house, Mr. Leonard still hesitated for approximately four and a half more minutes before he signed the consent form. He told the officers he did not want to answer questions. He twice requested to confer with Ms. Bean. He asked about the purpose of the search and was told the purpose was "to collect all the weed" that the officers had already seen. He asked why the officers had already gone in his house and was told that it was because Mr. Stanley was inside, and pot was "everywhere." His consent cannot be decoupled from his knowledge that the officers had just seen the marijuana.

Because the Government has not met its burden to show that it would have necessarily obtained a warrant on the information known to the police at the time Det. Tapley entered the trailer or that Mr. Leonard's consent was inevitable apart from the prior impermissible search, I find that the inevitable discovery doctrine does not apply.

## CONCLUSION

For the reasons stated above, I **GRANT** the motion to suppress.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 30th day of October, 2017.